**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RAFAEL FIGUEROA, *et al*, | ) | Civil Action No. 2:20-cv-01484 |
| | ) | |
| | ) | |
| Plaintiffs, | ) | Magistrate Judge Lisa Pupo Lenihan |
| | ) | |
| v. | ) | ECF No. 25 |
| | ) | |
| POINT PARK UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION ON DEFENDANT'S MOTION TO DISMISS

### I.  PREFACE

In Spring 2020 the global Covid-19 pandemic necessitated the closure of campuses worldwide and a temporary transition of essentially all United States post-secondary instruction to online. The question before this Court, as before numerous others nationwide, is not whether this sweeping alteration in the educational experience of students previously receiving a traditional on-campus post-secondary education was foreseeable, voluntary, or avoidable by either party.  Clearly it was not.  Nor is the question whether Defendant was justified in closing its campus. Clearly it was.  Nor is the question whether the university made appropriate efforts in response to an unprecedented public health crisis.  Surely it did. The question is: did the educational institution have a contractual obligation to provide in-person, on-campus learning to the Plaintiffs?  And: (a) If so, is it excused from financial liability for a difference in value

between the institution's traditional education and the virtual education necessitated (a difference perhaps informed by its own online course fees), as by, *e.g.*, a *force majeure* clause in its contract?[1]  *Or*   (b) If not, are the students nonetheless entitled to restitution, as by a theory of unjust enrichment or *quantum meruit*?

These are the questions that must inform the assignment of this portion of the pandemic losses – of education, employment, savings, homes, friendships, family, life itself – which befell us. And they are ones on which District and State Courts across the country continue to be divided.  For the reasons set forth fully below, the Court finds in answer to Defendant's Motion to Dismiss that Plaintiffs have stated a claim for (a) breach of contract under Pennsylvania law or, in the alternative, (b) unjust enrichment/*quantum meruit*.  It further concludes that they have failed to state a claim for conversion.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs (Rafael Figueroa, Kahlil Cabble, Ty'Anthony Scott, and Ryan Petty) and the putative class members are students who were participating in Defendant's on-campus educational program for the Spring 2020 semester. Defendant, Point Park University ("PPU" or "University"), is a private university with a principal campus located in downtown Pittsburgh, Pennsylvania.  The University offers major fields for undergraduate students, as well as a

---

[1] *Cf. Gibson v. Lynn University*, 2020 WL 7024463, at *3 (S.D. Fla. Nov. 29, 2020) (noting that even "a determination of whether the Force Majeure Provision or other statements in [defendant's] policies and publications foreclose Plaintiff's breach-of-contract claim is more appropriate at the summary judgment stage"); *Patel v. Univ. of Vt. & State Agric. College*, 2021 WL 1049980, *13-14 (D. Vt. Mar. 15, 2021) (dismissing breach of contract claim for "room and meal plan fees" where housing contract included Emergency Closing provision for retention of fees in case of "widespread pandemic"; denying dismissal of claims for other charges, including tuition); *Linder v. Occidental College*, 2020 WL 7350212, *2 (C.D. Cal. Dec. 11, 2020) (including express contract right "to change fees, modify its services, or change its program should economic conditions or national emergency make it necessary to do so").

2

number of graduate programs. It offers the traditional on-campus post-secondary degree program in which Plaintiffs were enrolled, and which was being provided to them in the first part of their Spring 2020 semester.  It also offers an online/virtual learning program, under a lower-cost tuition and fee structure.[2]

The university requires, as do some others, that students electing to "proceed[] with the online registration process" accept the "financial registration terms and conditions" set forth in the one-page document of the same name.  The Financial Registration Terms and Conditions (the "FRTC") provides, as one would expect, specific payment obligations being assumed by the student.  These include the section headings: Financial Responsibility, Late Fees/Business (Student Accounts) Hold, Collection Costs and Credit Reporting and Collection Communications.[3]  The final two sections contain (a) a Withdrawal Policy under which a student who "officially" drops or withdraws from classes "during the determined tuition refund periods" is "eligible for a refund of all or a portion of tuition and fees"[4] and (b) a reservation of PPU's

---

[2] Plaintiffs specifically allege that:

> Students could enroll in "online programs" with specific costs per credit and a $30 technology fee. (Compl. ¶ 22). Or students could enroll in traditional, on-campus programs, with higher costs per-credit and additional activity, university, and health services fees. (Compl. ¶¶ 20–21). Defendant's marketing materials further establish that these services are part of the bargain being offered. (Compl. ¶¶ 42–43).

ECF No. 34 at 4-5.  Plaintiffs further allege that the full-time undergraduate tuition costs were (a) approximately $15,600 (almost $20,000 for the Conservatory of Performing Arts) per semester, or approximately $2,600 (approximately $3,400 in the CPA) per 3-credit course.  In comparison, the "full online" undergraduate tuition cost was approximately $1,400 per 3-credit course.  *See* Complaint at ¶¶ 21-22.

[3] Under the FRTC, "[b]y clicking OK, [the student is] agreeing to payment of [PPU]'s tuition, fees, room, board and other charges on [the] student account by the due date, regardless of [any] expected reliance on third-party resources" and acknowledging a right to collection "for up to 20 years".  In the event of delinquency, late fees are assessed at $75/month and collection fees may be incurred up to an additional 50% of the amount charged and unpaid.

[4] The FRTC's provision of eligibility for drop/add or withdrawal refunds does not insulate Defendant from liability for tuition repayment or other restitution for *breach of the terms* of its contractual relationship with Plaintiffs.  That is, the conditions of contractual refund should a student seek an early termination do not define the conditions of entitlement to damages for a university's breach.  ECF No. 35 at 6.  *Cf. Smith v. Univ. of Penn.*, 2021 WL 1539493,

"right to change the financial registration terms and conditions at any time", with a

recommendation that the student therefore review them periodically. Notably, the FRTC does not

contain any express reciprocal obligation on the part of the University whatsoever.  It does not,

*e.g.*, contain any express provision obligating PPU to provide instruction *of any kind* (in-person

or other) or even to process the student's registration. Nor does it contain any specification of the

amounts or parameters of the charges the student is assertedly contracting to pay for "tuition,

fees, room, board" and unspecified "other charges". It contains no merger clause or language of

integration.  The FRTC is, in other words, precisely what its title suggests: an unintegrated

express documentation of some terms of particular importance to the University – *i.e*, students'

payment obligations.  ECF No. 26-1.  *See also* ECF No. 35 at 6 ("[T]he FRTC holds students

financially responsible for the cost of their education.").[5]

Plaintiffs allege that in exchange for amounts charged for their traditional education,

Defendant undertook to provide benefits and services unique to in-person learning – such as an

active, urban campus environment "in the heart of Downtown Pittsburgh"; "a full calendar of

[on- campus] student activities and events"; and the friendships, collaborations and social

---

*8 (E.D. Pa. Apr. 20, 2021) (concluding that university's website descriptions of fees as supporting a wide range of
services only available/accessible on campus "amount[ed] to a specific promise to provide [those] services,
resources and facilities to students" and "[t]he absence of language entitling students to fee refunds in the event of a
suspension of operations or closure does not relieve [university] of its obligation to provide what it specifically
promised").  Nor does it insulate Defendant from liability under a theory of unjust enrichment or *quantum meruit*.
*Cf. e.g., Bergeron v. Rochester Inst. of Tech.*, 2020 WL 74866682, *7 (W.D.N.Y. Dec. 18, 2020) (declining "to find
Plaintiffs had no reasonable expectation of a refund based on [university]'s refund policy" and declining to dismiss
claims for breach of contract or unjust enrichment).

[5] *Cf.*  ECF No. 27 at 3 ("'If a mutuality of promises is absent, the contract is unenforceable.' *Geisinger Clinic v. Di
Cuccio*, 606 A.2d 509, 512 (Pa. Super. Ct. 1992). . . . 'The test for consideration is whether the promisee, at the
instance of the promisor, has suffered any detriment, or whether, in return for the promise, he has done something
that he was not bound to do, or has promised to do some act, or has abstained from doing something.' *Ohama v.
Markowitz*, 434 F. Supp. 3d 303, 315 (E.D. Pa. 2020). . . . While the [FRTC] purports to bind the student to pay
'Point Park University's tuition, fees, room, board and other charges,' it does not actually require Defendant to
provide any benefits or services . . . .").

interactions of campus life.  ECF No. 34 at 7; *see e.g.*, Complaint at ¶ 42. These additional

benefits and services are assertedly represented through various PPU materials made available to

students, such as PPU's website, catalogs, promotional materials, circulars, and other admission

papers and publications.  *See e.g.*, Complaint at ¶¶ 42-43.  Plaintiffs therefore allege that, under

Pennsylvania law, these writings contained terms of their implied-in-fact contract with PPU.

 In March 2020, part-way through the Spring semester and in response to the pandemic

and government mandates, PPU closed its campus facilities and in-person services and activities

and moved all classes to virtual learning platform(s).[6]  Plaintiffs allege that:

> The cancellation of all in-person campus activity resulted in a unilateral reduction
> in benefits and services provided to Plaintiffs. The benefits provided to Plaintiffs
> during the latter part of the Spring, 2020 semester were similar to those offered to
> Point Park's online degree students, who pay a significantly lower tuition. The
> University's decision not to provide the agreed upon educational services and not
> to provide any refund of Plaintiffs' tuition or fees resulted in a breach of the
> contract between students and the University, and inequitable retention of funds
> by the University.

ECF No. 27 at 1.[7]

 Plaintiffs' putative class action brings claims for breach of contract, and in the

alternative, unjust enrichment and conversion against PPU based on its decisions to close campus

---

[6] More specifically, Plaintiffs allege that, beginning on March 13, 2020, PPU cancelled in-person classes and stopped providing any of the services or facilities the mandatory fees were intended to cover.  PPU provided prorated housing refunds only to students who vacated their campus housing on or before March 27, 2020 and not to students who vacated their housing thereafter. Complaint at ¶¶ 2-5.  *See also* ECF No. 26 at 4-5.

[7] *See also* Complaint at ¶ 40 (noting that PPU subsequently discounted its Summer 2020 semester tuition to be the same as its online tuition and fee, so long as "on ground" classes remained unavailable that Summer term); *id.* at ¶¶ 46, 48 ("During the online portion of the Spring 2020 semester, the University principally used programs by which previously recorded lectures were posted online for students to view on their own, or by virtual Zoom meetings. Some classes, however, stopped providing any instruction whatsoever and only required minimal assignments to be turned in . . . . Therefore, there was a lack of classroom interaction . . ." and of "collaborative learning and in person dialogue, feedback, and critique.").  *Cf. Botts v. Johns Hopkins Univ*, 2021 WL 1561520, *4 (D. Md. Apr. 21, 2021) (similarly noting plaintiff's allegations both that (1) university "implicitly admitted that students were harmed by the switch to 'online learning' when it announced a . . . reduction in undergraduate tuition" for the next semester, and (2) "many of the online classes were 'not even 'live' virtual instruction, but instead [were] merely recorded lectures for students to watch'").

and transition to online learning when it was unable to continue traditional education services. They seek compensation "commensurate with their loss of benefits", *i.e.*, partial reimbursement of charges incurred for tuition, fees, and housing.  ECF No. 27 at 1.  *See also* Complaint at ¶ 1 (bringing class action lawsuit "on behalf of all persons who paid tuition, housing (if living on campus), and/or [mandatory student] fees" for the Spring 2020 semester).[8]

Defendant moved to dismiss on February 3, 2021 and filed its Brief in Support at ECF No. 26.  Plaintiffs' Brief in Opposition and Defendant's Reply thereto were timely filed at ECF No. 27 and 28, respectively.  There followed three (3) filings in April of Supplemental Authorities by Defendant and each party's May 2021 supplemental briefings.  ECF Nos. 29-31, 34-35.  The Court has considered the parties' briefs, together with the cases subsequently cited. It has also conducted a careful independent review of relevant Pennsylvania law (particularly regarding the contractual relationship between students-universities) and a multitude of decisions in nationwide student-university pandemic refund cases issued both prior and subsequent to the parties' filings in this action.

---

[8] *See also id.* at ¶ 9 ("Plaintiffs seek, for themselves and Class members, the University's disgorgement and return of the prorated portion of its tuition and Mandatory Fees, proportionate to the reduction in contracted for services provided during the Spring 2020 semester when the University closed and switched to online distance learning, or, in the case of housing, for any members of the Class that moved out after March 27, 2020, a prorated portion of the housing fee for the days left in the semester after they moved out.").

As Defendant observes, although a claim for *pro rata* reimbursement of housing expenses is made on behalf of class members, no presently named Plaintiff is specifically alleged to have a claim for unreimbursed housing fees.  ECF No. 26 at 5-6. Plaintiffs fail to respond to Defendant's assertion that any housing fee claim should be dismissed for lack of standing.  ECF No. 26 at 10, n. 4; *see also generally* ECF No. 27 and 34.  The Court nonetheless finds that (1) Plaintiffs clearly have standing to bring this action; (2) questions regarding, *e.g.*, adequacy of representation are appropriately addressed during class certification proceedings; and (3) questions regarding, *e.g,* determinations of damages are also appropriately addressed during later proceedings.  *Cf. Patel*, 2021 WL 1049980, *15 (directing plaintiffs to provide a more definite statement of named plaintiffs' parking-fee claim if any).

## III.  APPLICABLE STANDARD OF REVIEW

The United States Court of Appeals for the Third Circuit has summarized the standard to

be applied in deciding motions to dismiss filed pursuant to Rule 12(b)(6):

> Under the "notice pleading" standard embodied in Rule 8 of the Federal Rules of
> Civil Procedure, a plaintiff must come forward with "a short and plain statement
> of the claim showing that the pleader is entitled to relief." As explicated in
> *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), a claimant must state a "plausible"
> claim for relief, and "[a] claim has facial plausibility when the pleaded factual
> content allows the court to draw the reasonable inference that the defendant is
> liable for the misconduct alleged." Although "[f]actual allegations must be
> enough to raise a right to relief above the speculative level," *Bell Atlantic Corp. v.
> Twombly*, 550 U.S. 544, 555 (2007), a plaintiff "need only put forth allegations
> that raise a reasonable expectation that discovery will reveal evidence of the
> necessary element." *Fowler*, 578 F.3d at 213 (quotation marks and citations
> omitted); *see also Covington v. Int'l Ass'n of Approved Basketball Officials*, 710
> F.3d 114, 117–18 (3d Cir. 2013).

*Thompson v. Real Estate Mortg. Network*, 748 F.3d 142, 147 (3d Cir. 2014). *See also Plastic

Surgery Ctr., P.A. v. Aetna Life Ins. Co*., 967 F.3d 218, 229 (3d Cir. 2020) ("The court must

accept all factual allegations in the complaint as true and draw all reasonable inferences in the

[nonmoving party]'s favor.").

In ruling on a motion to dismiss, the Court may consider "the allegations contained in the

complaint, exhibits attached to the complaint and matters of public record" together with any

document "integral to or explicitly relied upon in [framing] the complaint." *Schmidt v. Skolas*,

770 F.3d 241, 249 (3d Cir. 2014) (quoting *Pension Benefit Guar. Corp. v. White Consol. Indus.,

Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)); *In re Burlington Coat Factory Sec. Litig*., 114 F.3d

1410, 1426 (3d Cir. 1997).[9]  The FRTC  proffered by Defendant as an Exhibit to its Brief in

---

[9] The Third Circuit has also specified that courts may consider indisputably authentic documents.  *Spruill v. Gillis,*
372 F.3d 218, 223 (3d Cir. 2004); *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d
Cir. 1993).

Support of Motion to Dismiss, ECF No. 26-1, and to which Plaintiffs have responded, is

therefore properly considered in review of said Motion.  *See* EFC No. 26 at 3, n. 1.


## IV.  ANALYSIS

### A.  Plaintiffs Have Stated a Claim for Breach of Contract Under Pennsylvania Law

#### 1.  Pennsylvania Student-University Relationships are Governed by the Law of Implied Contracts

Under Pennsylvania law, the basic elements of a breach of contract claim are "(1) the

existence of a contract, including its essential terms, (2) a breach of the contract, and (3) resultant

damages." *Meyer, Darragh, Buckler, Bebeneck & Eck, P.LL.C. v. Law Firm of Malone

Middleman, P.C.*, 137 A.3d 1247, 1258 (2016) (quoted in *McCabe v. Marywood Univ*, 166 A.3d

1257, 1262 (Pa. Super. Ct. 2017) (considering action for breach of implied contract premised on

university's website and "various publications and materials")).[10]

In Pennsylvania, as in other states, "the relationship between a private educational

institution and an enrolled student is contractual in nature . . . ."  *Swartley v. Hoffner*, 734 A.2d

915, 919 (Pa. Super. Ct. 1999) ("Based upon the prior statements of our Court, as well as the

numerous learned decisions of other courts, we now hold that . . . .").[11]  And, as in other states, a

student's claim for breach of contract must be premised on a specific contractual undertaking by

the university. *See Cavaliere v. Duff's Bus. Inst.*, 605 A.2d 397, 404 (Pa. Super. Ct. 1992)

(recognizing potential cause of action for breach of implied contract had student "allege[d] that

---

[10] *Cf.* ECF No. 28 at 3 (objecting that "Plaintiffs do not cite a single case under Pennsylvania law permitting a student to proceed on an implied contract claim against an institution of higher learning"); discussion *infra*.

[11] *See also Barker v. Trustees of Bryn Mawr College,* 122 A. 220, 221 (Pa. 1923); *Reardon v. Allegheny Coll*., 926 A.2d 477, 480 (Pa. Super. Ct. 2007).  The law of Pennsylvania is also in accord with that of other states in looking to performance by the party-plaintiff as a necessary component of a breach of contract claim.

there was [a] specific undertaking, in the student handbook and catalog or otherwise" that was not met, but dismissing action as one for "educational malpractice" where complaint "amount[ed only] to a general allegation of lack of a quality education, without more").[12]

In *Cavaliere*, the Pennsylvania Superior Court considered whether the student-plaintiffs, who assertedly received "inadequate and improper instruction, *in breach of an alleged implied contract* for a quality education" could state a cause of action. *Id.* at 398-99 (emphasis added). The Court noted the rationale for declining to recognize a cause of action for educational malpractice.  *Id.* at 401-02.  It also noted, however, that in certain situations a private educational institution may be subject to an action for breach of contract.  *Id.* at 402 (citing with approval *Paladino v. Adelphi Univ.*, 89 A.2d 85 (N.Y. 1982) and *Malone v. Academy of Court Reporting*, 582 N.E.2d 54 (Oh. Ct. App. 1990)).[13]  The *Cavaliere* Court concluded that the case before it presented a "general allegation of a lack of a quality education, without more" and therefore, did not state a claim. It did, however,  concur with "the distinction drawn by" the *Paladino* and *Malone* courts, to allow an action where "the nature of the contractual undertaking and the breach thereof are clear and the plaintiff may be able to establish a cause of action against the offending institution."  *Id.* at 403-04.  *Cavaliere* closed with an overview of the determinative

---

[12] *See also David v. Neumann Univ.*, 187 F. Supp. 3d 554, 558 (E.D. Pa. 2016) ("[W]hile Pennsylvania law allows a student to sue a private university for breach of contract, the allegations must relate to a specific and identifiable promise that the school failed to honor.").  *Cf. e.g.*, *Bergeron*, 2020 WL 74866682, *5 ("[A] student must identify specifically designated and discrete promises" comprising the implied contract with a university, and "'[g]eneral policy statements' and 'broad and unspecified procedures and guidelines' will not suffice.") (citations omitted); *id.* at **1, 8 (finding, where university website and publications were "full of references to the on-campus experience" such as "student activities; campus amenities; class size; campus diversity; campus location and the like", promises of  the benefits of a particular "educational experience" alleged were "sufficiently specific to survive a Rule 12(b)(6) motion" on claim for tuition and fee reimbursement).

[13] In *Malone*, the student-plaintiffs alleged breach of contract where their enrollment was solicited "through a variety of advertising methods" wherein the school made representations that proved untrue.  The Ohio Court of Appeals reinstated the complaint, citing an earlier decision holding that an action against an educational institution "would lie for [breach of] an implied contract."  *Id.* at 402.

shortcomings in that action, including that it did not  "allege . . . any specific undertaking, in the

student handbook and catalog or otherwise" or that "there was any other specific

misrepresentation or failure to perform a contractual undertaking".  *See also Swartley v. Hoffner*,

734 A.2d 915, 919 (Pa. Super. Ct. 1999); *McCabe v. Marywood Univ*., 166 A.3d 1257, 1261 (Pa.

Super. Ct. 2017).

Because the multi-faceted contractual relationship between a university and its students is

generally not documented within a single integrated express writing, it is comprised of – and the

courts look to - the many different representations provided to the students during their

enrollment.  That is, student-university contracts are considered under the law of implied (or

"implied-in-fact") contract.[14]  *See Cavaliere, supra*.  More particularly, a few years after

*Cavaliere,* the Pennsylvania Superior Court specified that:

> [t]he contract between a private institution and a student is comprised of the
> written guidelines, policies, and procedures as contained in the written materials
> distributed to the student over the course of their enrollment in the institution. *See,
> e.g*., *Merrow v. Goldberg*, 672 F. Supp. 766, 774 (D. Vt. 1987) ("The terms of the
> contract are contained in the brochures, course offering bulletins, and other
> official statements, policies and publications of the institution."); *Jansen v. Emory
> Univ.*, 440 F.Supp. 1060, 1062 (N.D. Ga. 1977) (citing *Mahavongsanan v. Hall*,
> 529 F.2d 448 (5th Cir. 1976)).

*Swartley v. Hoffner*, 734 A.2d 915, 919 (Pa. Super. Ct. 1999).  *See also McCabe*, 166 A.3d  at

1261 (looking to the "various publications and materials produced by Marywood", including the

"website and literature" relied on by plaintiff "as the terms of an implied contract" in assessing

university's alleged breach of contractual duty).[15]  *Cf. Hickey v. Univ. of Pittsburgh*, 2021 WL

---

[14] This is implied-in-fact, as opposed to the implied-in-law, or quasi-contractual, analysis of an unjust enrichment
claim.  *See* Section IV(B).

[15]  The *McCabe* Court expressly declined to affirm dismissal of the action on the trial court's grounds.  Rather, it
accepted plaintiff's assertion of Marywood's contractual obligation in concluding that the lawsuit was speculative.
*Id.* at 1261-62.

1630579, *4 (W.D. Pa. Apr. 27, 2021) (noting that the implied contractual relationship between student-university recognized under Pennsylvania law is "not governed by a single document" but is comprised of the materials identified in *Swartley*); *id.* at *4 (looking to specific language from "websites, promotional materials, circulars, admission papers, and publications" in assessing plaintiffs' claim of implied contract).

In Pennsylvania, as elsewhere, "breach of contract actions brought by a party against a private college or learning institution [are] treated as any other contract." *Reardon v. Allegheny Coll.*, 926 A.2d 477, 480–81 (Pa. Super. Ct. 2007) (reaffirming this "central premise") (citing *Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 428 (2001)); *id.* ("[W]e review the agreement between the parties [regarding the alleged breach], contained within a portion of the student handbook . . . as we would any other agreement between two private parties.").[16] *See*

_See also, generally,_ 15A Am.Jur.2d Colleges and University, Section 25, <u>Relationship between student and university</u> ("The student/university relationship is essentially contractual in nature.  The terms of the contract may include statements provided in student manuals and registration materials, as well as catalogues, bulletins, circulars, and regulations of the institution made available to the student.  When a student enrolls at a university, an implied contract arises . . . ."); _see also, e.g._, _Metzner v. Quinnipiac Univ._, 2021 WL 1146922 , at *8 (D. Conn. Mar. 25, 2021) ( "Because a student bases his or her decision . . ., in significant part, on the documents received concerning core matters, such as faculty, curriculum, requirements, costs, facilities and special programs, application of contract principles based on these documents and other express or implied promises . . . appears sound." ) (citation omitted).

As noted, _supra_, in _Swartley_ the Pennsylvania Superior Court cited with approval the examples of representational materials set forth by the District Court of Vermont in _Merrow_.  More recently, that same Vermont District Court made clear (as did the Pennsylvania Superior Court in _McCabe)_ that the university representations encompassed under the _Swartley-Merrow_ standard include those made in online materials/websites. _See Patel v. Univ. of Vt. & State Agric. College_, 2021 WL 1049980 (D. Vt. Mar. 15, 2021).

In light of Defendant's briefings, the Court emphasizes the clarity with which its survey of decisions revealed both (1) a decades-long and wide adoption of the general principles set forth in the treatise cited above – _i.e._, student-university contracts are considered under the jurisprudence of implied contract and courts generally broadly consider official materials promulgated by a university in determining the specific representations on which its students might reasonably rely; and (2) that Pennsylvania law has developed in accord with these same principles.

[16] _See_ ECF No. 34 at 8 ("There is no Pennsylvania authority suggesting or holding that there is anything unique about the types of contractual relations between students and universities."); _cf. id._ at 2-3 (referencing three recent decisions regarding breach of contract claims against Pennsylvania universities )(citing _Smith v. Univ. of Penn._, 2021 WL 1539493 (E.D. Pa. Apr. 20, 2021) ("Penn"); _Ryan v. Temple Univ._, Case No. 5:20-cv-02164-JMG, 2021 WL 1581563 (E.D. Pa. Apr. 22, 2021) ("Temple"); _Hickey v. Univ. of Pittsburgh_, Case No. 2:20-cv-00690-WSS, 2021 WL 1630579 (W.D. Pa. Apr. 27, 2021) ("Pitt")).

*also e.g.*, *Botts*, 2021 WL 1561520, *11 ("[A]s with any Maryland breach of contract claim, a student plausibly states a claim under Rule 12(b)(6) if she states facts showing a contractual obligation owed . . . and [breached]").  Thus, the question is one of the Plaintiffs' reasonably foreseeable reliance on the alleged specific promise, just as in any other implied contract analysis.  *See Gati v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*, 91 A.3d 723, 731 (Pa. Super. Ct. 2014) (The "essence of the bargain between student and university" is the student's "reasonable expectation based on statements of policy by [the university] and the experience of former students . . . .").[17] *See also e.g.*, *Arrendondo v. Univ. of La Verne*, 2021 WL 1588995, *2 (C.D. Cal. Apr. 21, 2021) ("Because no formal contract typically exists between a student and university, 'the general nature and terms of the agreement are usually implied, with specific terms to be found in the university bulletin and other publications . . . .'  To determine whether representations from such sources become part of the contract, the Court looks at the reasonableness of the parties' expectations at the time the contract was formed by considering the totality of the circumstances.  'The reasonableness of the student's expectation is measured by the definiteness, specificity or explicit nature of the representation at issue.'") (citations omitted); *Nguyen v. Stephens Inst.*, 2021 WL 1186341, *3 (N.D. Cal. Mar. 30, 2021) (similar statement of principles); *Walker v. President & Fellows of Harvard Coll.*, 840 F3d 57, 61-62 (1st

---

*Cf. also* ECF No. 26 at 2 ("Pennsylvania law is clear that contracts between universities and their students must be comprised of express, written promises and cannot be supplemented (or changed) by implied contract terms or course of conduct.").  After careful and informed consideration, the Court must strongly differ with this parenthetical quotation to the extent it is intended to read the law of implied contracts out of the Pennsylvania Court cases applying it or to confine consideration of the parties' contractual relationship to the terms of the FRTC.  The Court further notes that Plaintiffs *sub judice* assert written representations in university-promulgated materials properly considered under governing Pennsylvania law.

[17] That the *Gati* Court identified and considered aspects of former students' experience relevant to the plaintiffs' dispute (*e.g.*, issuance of a degree) did not, of course,  limit its general statements of law regarding the relevance of reasonable expectations and course of conduct to student-university contracts. *Cf.* ECF No. 35 at 5 n. 3.

Cir. 2016) ("Where [a student] sues a school alleging breach of contract, the standard of reasonable expectation applies" and "courts ask . . . what meaning the party making the manifestation, the university, should reasonably expect the other party, the student, to give it"); *Durbeck v. Suffolk Univ.*, 2021 WL 2582621, *8 (D. Mass. June 23, 2021) (finding that implied-in-fact contract derived from university's representations "viewed in context with the Plaintiffs' payments of fees and tuition" and pre-pandemic "registration for and attendance at on-campus classes").[18]

For Plaintiffs to maintain a claim for breach of contract, the Complaint allegations must of course be "sufficient to draw the reasonable inference that the parties engaged in conduct giving rise to an implied-in-fact contract" under the presently applicable standard. *8 KT.TV, LLC v. Entest Biomedical, Inc*., 2011 WL 5374515, at *5 (M.D. Pa. Nov. 7, 2011).  And ultimate determinations of a contract's existence and terms are for the finders of fact. *Ingrassia Constr. Co. v. Walsh*, 486 A.2d 478, 483 (Pa. Super. Ct. 1984).

---

[18] *Compare* ECF No. 28 at 3, ECF No. 35 at 4-6 (contending, from *Swartley*'s observation that a valid breach of contract claim must be "*linked* to the written policies of the university", that "[l]ongstanding Pennsylvania law is clear that a viable breach of contract claim against a university requires an express, written promise" and thus *rejects* an implied contract theory) (citing 734 A.2d at 919) (emphasis newly added) *with Swartley*, 734 A.2d at 919 (noting that contract is comprised of various "written materials distributed to the student over the course of their enrollment," with citation to *Merrow*, and considering whether any provision of those documents "links" the students' allegations to "the contractual relationship").

In other words, *Swartley*'s requirement that the alleged breach be "linked" to (*e.g.,* based on) a (sufficiently definite) written representation is consistent with and guides – and does not *abrogate* – other longstanding rules of contract interpretation.  The question of reasonable expectation/reliance remains, in Pennsylvania student-university contract actions as in others.  *See id.* (considering the circumstances and "context of the provisions" cited by plaintiff in concluding her "tortured interpretation" ran "contrary to notions of plain meaning, logic and common sense" and "as a result" dismissing claim). *Cf. Hickey*, 2021 WL 1630579, *4 (implied contractual relationship between student-university recognized under Pennsylvania law "arises where the obligations and intentions . . . are not specifically expressed, but rather 'inferred from acts in the light of the surrounding circumstances'") (citing *Liss & Marion, P.C. v. Recordex Acq. Corp.*, 983 A.2d 652 (Pa. 2009)).

**2.  Under Pennsylvania Law, Plaintiffs State a Claim for Breach of Implied Contract Based on Reasonably Foreseeable Reliance on Defendants' Written Representations of In-Person On-Campus Education Provided at a Premium**

Applying the law of Pennsylvania more specifically to the case before this Court on Motion to Dismiss:

The FRTC is an unintegrated document (1) setting forth express written undertakings solely on the part of the student, and (2) which on its face requires reference to external documents and/or representations to complete otherwise amorphous or ambiguous terms.[19] These aspects of the document need not, however, trouble the Court at this time.  Because although it does not appear to be an independently enforceable agreement, the FRTC may - in keeping with the general nature of student-university relationships – appropriately be considered as one component of an implied-in-fact contract, a contract further informed by (a) other written representations made to the students during their enrollment, and (b) their resultant reasonable

---

[19] In addition to its apparent absence of any consideration on Defendant's part, *see supra* at 4 n.5, the FRTC fails to address the essential/material terms of a valid contract. Where a contract fails to express with certainty the nature and extent of the parties' obligations, or is otherwise too vague/indefinite with respect to an essential term, it is not enforceable.  *See Lackner v. Glosser*, 892 A.2d 21, 30 (Pa. Super. Ct. 2006)).

Reading the FRTC to commit PPU only to presenting charges on students' accounts for payment, without more, would leave it potentially void for want of consideration.  Similarly, reading it to commit PPU only to registering students in exchange for payment of any amount of tuition and other mandatory fees charged to them, without more, would raise questions of its unenforceability as a contract of adhesion.  Were the FRTC to be void, unenforceable or (on the basis of its retention of a unilateral right to modify its terms) any obligations illusory, the Court would still consider the promises allegedly made in the other materials promulgated by the University and comprising part of its implied-in-fact contract.  *See e.g, Rhodes v. Embry-Riddle Aeronautical Univ., Inc.,* 2021 WL 140708, at *5-6 (M.D. Fla. Jan 14, 2021) (finding plaintiffs adequately pleaded breach of contract, noting that "surely those on-campus students are paying for *something*") (emphasis in original)*; Patel*, 2021 WL 1049980, *7 (distinguishing cases pursuing only breach of express contract claim and noting that: "It is beyond reasonable dispute that *some* contract exists between [university] and its students [and w]hich terms may be reasonably inferred . . . is a factual issue."); *id.* at *8 (distinguishing *Horrigan v. Eastern Michigan Univ*, 2020 WL 6050534 (Mich. Ct. Cl. Sept. 24, 2020) (where plaintiff relied "on an alleged express agreement presumably the Tuition Agreement" which "did not contain promises about the method of instruction") and four other cases); *Nguyen*, 2021 WL 1186341, *3 (noting that university "correctly asserts that [express written agreement] did [not] promise to provide in-person instruction or access to on-campus services" but "neglects to mention [that said writing] is not inclusive of all terms of the contract"); *id.* (noting plaintiff's allegation that university "made the promise . . . in its 'marketing, advertisements, and other public representations' . . . [and a]s such, these statements" were also part of the implied contract).

expectations given (c) the surrounding context and parties' course of conduct.[20]  *See generally, Atlantic Richfield Co. v. Razumic*, 480 Pa. 366, 376, 390 A.2d 738 (1978) (course of performance is "always relevant in interpreting writing" and is "perhaps the strongest indication of what the writing means") (citing *Restatement (Second) of Contracts*, § 228).

Plaintiffs point to the written materials informing their contractual relationship with Defendant (*e.g.*, promotional materials, circulars, admissions papers, and publications) assertedly evidencing a mutual understanding that tuition and other charges on students' accounts were paid for components of their traditional post-secondary education, *i.e.* one delivered in-person and on campus. Complaint at ¶ 42-43.[21] *See also* ECF No. 34 at 9 (noting PPU's website distinction between "[a]n undergraduate first-time student[, who] is someone *who . . . will attend on-campus classes*" and an "online degree" student, who "will learn in a flexible, convenient online environment") (emphasis added).[22]  Plaintiffs have satisfactorily alleged  that PPU should have reasonably foreseen that they would expect, when they were billed for the Spring 2020 semester, that PPU would continue providing the traditional education benefits/services allegedly promised, or refund the tuition and fee premiums paid/difference in value.  *See e.g., Patel*, 2021

---

[20]  *See Penn*, 2021 WL 1539493, at *5 ("[T]he contract is comprised of more than the Financial Responsibility Statement and related financial policies . . . ."); *Pitt*, 2021 WL 1630579, at *4 (acknowledging that despite existence of Financial Responsibility Agreement, plaintiffs could allege an implied contract claim arising from other evidence).  *See also, e.g.*, *Chong v. Ne. Univ.*, 2020 WL 7338499, *3 (D. Mass. Dec. 14, 2020) (holding that Financial Registration Agreement was meant to be read "in conjunction with" other university representations and court could not "as a matter of law, say that no student  . . . could have reasonably expected that executing the FRA and registering for on campus courses would entitle them to in-person instruction").

[21] PPU identifies, as part of its "full-time undergraduate costs", semester fees of between $75 and $325 for each of these four categories: University Fee, Technology Fee, Activities Fee and Health Services Fee.  Complaint at ¶ 20. Of these, only the Activities Fee was later refunded.  *Id.* at ¶ 37.  And Plaintiffs assert that "the various fees Defendant charged, in addition to the tuition, were directly tied to activities and services which could only be provided if the students were on campus."  ECF No. 34 at 2.

[22] *Cf.*, *Botts*, 2021 WL 1561520, *3 (noting website and handbook indications that enrolled students were expected to be on campus).

WL 1049980, *7 (where "course catalogue distinguishes between 'online' and other types of

instruction" and "website tout[s] the advantages of" university campus, "factfinder could

conclude that [university] promised its students that their academic courses would be largely in-

person and that they would receive the benefits of on-campus (and adjacent) facilities and

activities"); *id.* (collecting cases to reach same conclusion); *Verlanga v. Univ. of S.F.*, 2020 WL

7229855, *4 (Cal. Super. Ct. Nov. 12, 2020).[23]

---

[23] This Court rejects an argument that PPU's representations were mere "puffery" or merely "vague" or "aspirational" and therefore outside the Court's implied contract claim consideration on motion to dismiss. *See, e.g.*, ECF No. 35 at 7-8; ECF No. 26 at 8 ( "[I]nformational materials, such as a university's website and brochures distributed to prospective applicants, are not part of a student's contract'") (quoting *Penn*, 2021 WL 153949 at *6) . *Cf. Penn*, 2021 WL 1539493, *8 (finding that website descriptions "amount to a specific promise to provide" services/activities/facilities "many of which are only available and accessible on-campus" in declining to dismiss breach of contract claim as to fees as well as tuition). *See also e.g.*, *Botts*, 2021 WL 1561520, *12 (noting as official statements/publications informing "promise to provide in-person instruction", website's description of "the abundance of facilities and amenities on campus, including access to laboratories and libraries, as well as the opportunities for interaction with faculty and students, experiential learning, and extracurricular activities").

 The *Botts* Court went on to say that, while "[t]here is authority that suggests [website/other] promotional statements, on their own, may not amount to an express, enforceable promise to provide *in-person* education . . . . [T]his is not a typical contract situation where there is an express document with delineated terms that a plaintiff can reference. . . .[And] even if [University]'s 'promotional statements do not constitute a binding [or express] promise of in-person education,' they 'can help define the scope of an implied contract.'" *Botts*, 2021 WL 1561520, *13 (citations omitted). It concluded that, read in the light most favorable to plaintiff, the promotional materials identified "tout the University's on-campus resources and facilities" and "imply in-person participation." It further concluded - where plaintiff also alleged that the University (1) expected/sometimes required on campus attendance, (2) charged significantly less for online degree programs, (3) customarily and historically offered on-campus and in-person educational services, and (4) began the Spring semester in-person and on campus – that "the allegations are sufficient to support a claim that, at the very least, [University] and plaintiff had an implied contract for in-person, on-campus instruction." 2021 WL 1561520, *16.

*See also e.g.*, *Doe v. Emory Univ.*, 2021 WL 358391, *6 (N.D. Ga. Jan. 22, 201) (holding that "promotional statements . . . help define the scope of any implied contract" and when combined with allegations concerning defendant-school's "customary practice and the Plaintiffs' payment of tuition", a plausible implied-in-fact contract was pled); *Metzner*, 2021 WL 1146922, at *10 ("Plaintiffs have alleged more than mere "aspirational" language [where Bulletin and website] tout such features as "state-of-the-art facilities," "outdoor spaces," "classroom and immersive experiential learning," and "the beauty of New England" and Plaintiffs further allege [university] charges students significantly less for online degree programs."); *id.* ("Such allegations in combination with the parties' alleged course of conduct allow the reasonable inference that the parties may have at least implicitly entered into a specific agreement for on-campus instruction . . . ."); *Arrendondo*, 2021 WL 1588995, *2 (finding allegations that defendant's website and social media marketing materials – both depicting and promoting "in-person instruction and on-campus experiences . . . support that defendant made sufficiently specific representations to infer a contractual promise to provide at least some in-person instruction and on-campus services"); *Nguyen*, 2021 WL 1186341, *3 (collecting cases).

The Court also rejects an assertion that as a matter of law Defendant fulfilled its promises and owed no further obligation to students who received the opportunity to complete course grades and/or academic credits. *See, e.g.*,

### 3.  Plaintiffs' Claim is Not Barred as a Claim of Educational Malpractice

Finally, and relatedly, Plaintiffs raise no claim of "educational malpractice".  Defendant asserts, however, as an alternative ground for dismissal, that Plaintiffs' claims are not viable because they cloak what is essentially an impermissible challenge to PPU's academic discretion. *See* ECF No. 26 at 13-14; *id.* at 2 ("[C]ourts widely agree that complaints attacking educational quality and pedagogical choices are inherently speculative and do not survive dismissal.").

Like most other jurisdictions, this Court's jurisdiction does not recognize an action for general "educational malpractice" [24] but does permit one for breach of a contract.  *See e.g., Cavaliere,* 605 A.2d at 403-04 (dismissing action where "there is no pleading of any other specific misrepresentation or failure to perform a contractual undertaking [and t]he sole allegation is that the instruction and instructors provided by the school were generally inadequate and of low quality"); *id.* at 404 (noting that court could "fathom no policy against permitting a cause of action for breach of contract" against the school where "the nature of the contractual undertaking and the breach thereof are clear"). *See also Durbeck,* 2021 WL 2582621, *3; *Ross v. Creighton Univ*, 957 F.2d 410, 417 (7th Cir. 1992) (distinguishing claim that university failed to perform adequately from claim "that it failed to perform [a particular] service at all").

---

*Patel*, 2021 WL 1049980, *5 (Plaintiffs "bargained for in-person instruction and studies . . ., access to [university] buildings and amenities, participation in on-campus student activities and physical proximity to the [city] . . ."); *Durbeck*, 2021 WL 2582621, *10 ("Plaintiffs plead an implied-in-fact contract for far more than just 'academic requirements, courses or programs of study'"); *Ford v. Rensselar Polytechnic Inst.*, 2020 WL 7389155, *6 (N.D.N.Y. Dec. 16, 2020) ("[W]hat a student expects to receive in exchange for tuition money covers much more territory than simply the right to take classes."); *Bergeron*, 2020 WL 7486682, at *7–8; *Botts*, 2021 WL 1561520, *13 (rejecting university's contention that its only obligation was that "if the student complies with the terms prescribed . . . , the student will obtain a degree").  *Cf. e.g.,* Complaint at ¶ 42 ("The true college experience doesn't just happen in classes . . . .  It's what happens when you live on campus.") (quoting PPU website section describing student's "home" on "unique urban campus" and opportunities, activities and events on-campus and in the city).

[24] An educational malpractice claim is premised on educational services of less adequate, effective, or beneficial quality than that promised. *See, e.g.*, *Geisinger,* 606 A.2d at 404.

This Court concurs, therefore, with the significant majority of Courts across the country which have considered whether a similar post-pandemic claim should be precluded as a claim for educational malpractice and concluded it should not.[25]  More specifically, here as in other such actions, Plaintiffs seek reimbursement for services for which they paid but which were not received.  Such claims are grounded in contract, not educational malpractice, and are therefore justiciable.  *See Smith v. Univ. of Penn.*, 2021 WL 1539493, *4 ("This is not a claim for educational malpractice.  It is simply an action for breach of contract.").[26]

### 4.  Summary of Analysis Regarding Denial of Motion to Dismiss as to Plaintiffs' Breach of Contract Claim

To summarize, then, the Court's determination on Plaintiffs' breach of contract claim:

Plaintiffs sufficiently plead an implied contract under Pennsylvania law "to provide in-person, on-campus instruction, experiences, and activities."  ECF No. 34 at 4.  They specifically allege that PPU promised – in the official materials promulgated in electronic and print form during the students' enrollment -  a particular method of instruction[27] for which students paid a

---

[25] *See, e.g.*, *Patel*, 2021 WL 1049980, *6 & n. 3 (citing cases); *Metzner*, 2021 WL 1146944, *7-8  (compiling cases in Florida, California, Utah, Massachusetts, New York, Illinois, Indiana, Ohio and Connecticut); *Durbeck*, 2021 WL 2582621, *4-5 (collecting Massachusetts cases).

[26] *See e.g., Botts*, 2021 WL 1561520, *7 ("Ascertaining the meaning of [University's] materials is an exercise in contract interpretation which does not require an 'improper judicial foray[] into evaluations' of academic judgments . . . .") (quoting *Metzner*, 2021 WL 1146922, at *6); *McCarthy v. Loyola Marymount Univ.*, 2021 WL 268242, at *3 (C.D. Cal. Jan. 8, 2021) (observing that pandemic "shift to online education can hardly be characterized as an 'academic decision' within the meaning of [the educational malpractice] doctrine"); *Saroya v. Univ. of the Pac.*, 2020 WL 7013598, at *4 (N.D. Cal. Nov. 27, 2020).  As other Courts have also noted, allegations comparing online to in-person instruction do not convert Plaintiffs' breach of contract claim to one of educational malpractice.  *See e.g.*, *Oyoque v. DePaul Univ.*, 2021 WL 679231, *2 (N.D. Ill. Feb. 21, 2021) (discussion of difference in value speaks to damages and "is not an allegation that any decreased value constitutes the breach"); *Omori v. Brandeis Univ.*, 2021 WL 1408115, *2 (D. Mass. Apr. 13, 2021); *Patel*, 2021 WL 1049980, *5 & n.2 (same, distinguishing *Lindner v. Occidental Coll.*, 2020 WL 7350212 (C.D. Cal. Dec. 11, 2020) and *Gociman, et al v. Loyola Univ. of Chicago*, 2021 WL 243573, (N.D. Il. Jan. 25, 2021)).

[27] *See generally, e.g.*, *Doe v. Bradley Univ*, 2020 WL 7634159, *2 (C.D. Ill. Dec. 22, 2020) (collecting cases denying motions to dismiss where students alleged contracts "for in-person instruction based on university handbooks, catalogs, and brochures"); *Botts*, 2021 WL 1561520, *15 (same); *Salerno v. Fla. S. Coll.*, 488 F.Supp.3d 1211, 1217 (M.D. Fla. 2020) (denying motion where defendant's materials "touted its many resources and facilities

premium in tuition and fees, but delivered a lower-cost option which the students had previously declined.[28]  Defendant points to no contractual exemption from liability for non-delivery of its traditional educational services.  *Compare, e.g.*, *Linder,* 2020 WL 7350212, \*2  (including express contract right "to change fees, modify its services, or change its program should economic conditions or national emergency make it necessary to do so"); *Durbeck,* 2021 WL 2582621, \*11 (citing cases distinguishing *Linder*'s *force majeure* clause).  Thus, Plaintiffs are "entitled to investigate through discovery whether Defendant's retaining *all* monies despite providing a profoundly altered product breached a contractual promise." *Arrendondo*, 2021 WL 1588995, \*3.  Defendant's Motion to Dismiss will therefore be denied as to this claim.

## B.  In the Alternative, Plaintiffs Have Stated a Claim of Unjust Enirchment or *Quantum Meruit*

Defendant asserts that Plaintiffs (a) may not state a claim for unjust enrichment as a matter of law because they have an adequate remedy under their breach of contract theory and (b) fail to plead facts sufficient to state a claim. ECF No. 26 at 15. Plaintiffs respond that their unjust enrichment claim is pled in the alternative and sufficiently. ECF No. 27 at 18-20.

---

– all of which were located on the campus thereby implying in-person participation"); *Milanov v. Univ. of Mich.*, 2020 WL 7135331, \*3 (Mich. Ct. Cl. July 27, 2020).

[28] *See, e.g.*, *Metzner*, 2021 WL 1146944 (noting that students did not register for lesser-fee online courses but elected instruction described in "recruitment" materials as in-person on-campus learning experience); *Rosado v. Barry Univ. Inc.*, 2020 WL 6438684, at \*3 (S.D. Fla. Oct. 30, 2020) (finding plaintiff's "allegations that [University] accepted more per credit for in-person classes" and "actually provided in-person education to [plaintiff] until March 19, 2020, in the backdrop of numerous other documents referring to in-person classes and amenities, are sufficient to establish, at minimum, an implied contract"); *Salerno v. Fla. Southern Coll.*, 488 F. Supp. 3d 1211, 1216-17 (M.D. Fla. 2020); *Omori*, 2021 WL 1408115, \*3 ("[S]tatements in [university]'s online publications, academic bulletins and course listings" supported "inference that [university] should have reasonably expected its prospective students to understand" university to have offered "in-person instruction and on-campus facilities and experience", in consideration of which "students paid the (higher) on-campus tuition and fees charged for the Spring 2020 academic term and registered for on-campus courses"); *Moran v. Stonehill Coll., Inc.*, 2021 WL 965754 (Mass. Super. Feb. 16, 2021) (where plaintiff elected in-person and not online track, based on statements touting on-campus experience, plaintiff plausibly had a reasonable expectation of in-person instruction).

A contract implied-in-law, known as a "quasi-contract" or "unjust enrichment", is a legal fiction created by common law courts to permit recovery by contractual remedy in cases where there is found to be, in fact, no contract, but where circumstances are such that justice warrants a recovery as though there had been a promise.  See *Restatement (Second) of Contracts*, § 4 (1981).  Thus, a party with an otherwise adequate remedy at law cannot claim unjust enrichment. However, as there are sometime inadequacies in contractual remedies at law, it is widely accepted practice to pursue unjust enrichment in the alternative at the pleading stage.

Indeed, Federal Rule of Civil Procedure 8(d) permits plaintiffs to plead such alternative legal theories. *See, e.g., Vantage Learning (USA), LLC v. Edgenuity, Inc*., 246 F. Supp. 3d 1097, 1100 (E.D. Pa. 2017) ("Rule 8(d)(2) nonetheless permits a plaintiff to plead unjust enrichment in the alternative in certain circumstances, even where the existence of a contract would preclude recovery. . . ."). Plaintiffs may plead unjust enrichment or *quantum meruit* at this juncture, despite their assertion of PPU's breach of a governing implied contract (which Defendant disputes while contending a governing express contract comprised solely of the FRTC).  *See, e.g.*, *Southersby Dev. Corp. v. Twp. of S. Park*, 2015 WL 1757767, at *15 (W.D. Pa. Apr. 17, 2015) ("[P]laintiffs may plead an unjust enrichment claim in the alternative . . . where there is some dispute as to whether a valid, enforceable written contract exists.") (citations omitted); *Bergeron*, 2020 WL 74866682, *9 (same); *Omori*, 2021 WL 1408115, *4 (denying motion to dismiss unjust enrichment claim as precluded by breach of contract action where university simultaneously "disputes the existence of any contract between the parties requiring in-person instruction and access to on-campus facilities and resources").

A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity for one to retain a benefit which has

come to him at the expense of another. To state a claim for unjust enrichment under Pennsylvania law, a plaintiff must allege: (1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value. *See, e.g.*, *Sovereign Bank v. BJ's Wholesale Club, Inc*., 533 F.3d 162, 180 (3d Cir. 2008).[29]  Plaintiffs allege that "the retention of the in-person and on-campus fees are inequitable and unjust, because Defendant only provided education and services similar to those provided to online students, which comes at a significantly lower cost." ECF No. 27 at 19 (citing Complaint at ¶¶ 82-86).  "Unjustness" is a quality that turns on reasonable expectations.[30]

Plaintiffs allege (1) they paid tuition and other fees to PPU, and PPU provided a traditional in-person on campus education for the first portion of the Spring 2020 semester and an online education for the second portion; but (2) it was reasonable for Plaintiffs to have expected, in reliance on PPU's specific representations, a continuation of their traditional education for the entire Spring semester.  Drawing all reasonable inferences in Plaintiffs' favor, and despite PPU's provision of grades and academic credit, it cannot be said as a matter of law that PPU's actions were not unjust under the circumstances. *See, e.g.*, *Durbeck*, 2021 WL

---

[29] *See also Lauren W. ex rel. Jean W. v. Deflamin*, 480 F.3d 259, 277 (3d Cir. 2007) (citing *Allegheny Gen. Hosp. v. Philip Morris, Inc*., 228 F.3d 429, 447 (3d Cir. 2000)).

[30] The term *quantum meruit,* while often used interchangeably with "unjust enrichment", may be more apt. Whereas a claim of unjust enrichment essentially asks whether a defendant unfairly benefitted from the circumstances alleged, *quantum meruit* asks whether a plaintiff received fair value in the exchange. *See e.g., Eastland v. Du Pont*, 1996 WL 421940, at *5 (E.D. Pa. July 23, 1996) (noting distinction "between proof of damages under the theories of unjust enrichment and of quantum meruit" as "respectively, the value of the benefit conferred and the value of the services rendered"); *id.* ("Quantum meruit is the method commonly used to put a value on the services for which payment should be made in a quasi-contract case. Unjust enrichment occurs when there exists a retention of a benefit conferred by another, without offering compensation in circumstances where compensation is reasonably expected.") (citing *Black's Law Dictionary* 1573 (8th ed. 2004)).  Here, under either quasi-contractual theory - unjust enrichment or *quantum meruit* - the damages at issue would be the difference between the price paid and fair value of the benefits conferred. *Cf. Bergeron*, 2020 WL 74866682, *8 ("It is clear that Plaintiffs are attempting to recover 'market damages'. . . .") (citation omitted).

21

2582621, *12 ("Even if [Plaintiffs] received a substantial benefit from [their] payments of tuition and fees, it may still be inequitable for [the university] to retain their full value.") (quoting *Rhodes*, 2021 WL 140708, *7).  Whether the partial failure of consideration alleged was *de minimis* or sufficient to justify at least partial reimbursement of tuition and/or other fees paid to PPU is, as Plaintiffs duly note, "a matter of proof" appropriate for a later stage of the proceedings.  ECF No. 27 at 20.[31]

In sum, whether and to what extent the parties have entered into a contractual relationship for the provision of in-person on-campus educational services will be better resolved following discovery.[32] Plaintiffs have sufficiently stated a claim for unjust enrichment or *quantum meruit* in the alternative.  Defendant's Motion to Dismiss will therefore be denied as to this claim.

## C.  Plaintiffs Have Failed to State a Claim for Conversion

Defendant asserts that under Pennsylvania law, "a claim for conversion cannot stand when there is a contract between the parties that governs the same disputed funds."  ECF No. 26 at 17 (citing *Scott v. PNC Bank, Nat'l Ass'n*, 785 F.App'x  916, 920 (3d Cir. 2019)).  It also asserts that Plaintiffs have failed to allege breach of any duty "imposed by law as a matter of social policy."  *Id. See also Bruno v. Erie Ins. Co.*, 106 A.2d 825, 829 (Pa. 1992).

Under Pennsylvania law, the required elements of a conversion claim are: "(1) the deprivation of another's right of property in, or use or possession of, a chattel, or other

---

[31] *See Rosado v. Barry Univ Inc.*, 499 F.Supp.3d 1152, 1160 (S.D. Fla. 2020) (despite the university's disputing that "the retention of the payments was 'unjust', a motion to dismiss tests the sufficiency of the pleading, not the merits of the case"); *Botts*, 2021 WL 1561520, *12 (noting that "even if plaintiff received a substantial benefit" for tuition, the "question of whether the institution was unjustly enriched . . . is a question improper for resolution on a motion to dismiss") (quoting *Quinnipiac*, 2021 WL 1146922, at *11).

[32] *See, e.g.*, *Botts*, 2021 WL 1561520, *18 (where university "disputes the existence of a valid contract for in-person education" it is "too early to determine whether plaintiff is likely to prevail on her contract claim" and "[t]herefore, it would be premature to bar [her] alternative claim of unjust enrichment" on motion to dismiss); *id.* (providing case citations).

interference therewith, (2) without the owner's consent, and (3) without lawful justification." *Vavro v. Albers,* 2006 WL 2547350, at *13–14 (W.D.Pa. Aug. 31, 2006) (quoting *McKeeman v. Corestates Bank, N.A.,* 751 A.2d 655, 659 n. 3 (Pa. Super. Ct. 2000)).  *See also Shonberger v. Oswell,* 530 A.2d 112, 114 (Pa. Super. Ct. 1987) (citing *Stevenson v. Economy Bank of Ambridge*, 197 A.2d 721, 726 (Pa. 1964)).[33]

As in other states, money may be a chattel for the purposes of conversion in Pennsylvania. *Id.* (citing *Pearl Assurance Co. v. National Ins. Agency*, 30 A.2d 333, 337 (Pa. Super. Ct. 1943).  As conversion contemplates re-delivery of goods, however, the funds must be able to be described, identified, or segregated in the manner that a specific chattel can be.  *See, e.g., Pioneer Commercial Funding Corp. v. Am. Fin. Mortgage Corp*., 855 A.2d 818, 827, n. 21 (Pa. 2004) (funds must be in some way "identifiable"); *In re Zambrano Corp.*, 2010 WL 8354694, at *6 (Bankr.W.D.Pa. Aug. 24, 2010) (funds can be identified by, *e.g.*, description or segregation from other funds). And, however they are identified, there must be "an obligation on the part of the defendant to return the specific coin or notes [e]ntrusted to his care", rather than an obligation to return monies generally.  *Alexander & Co. v. Goldstein,* 13 Pa. Super. 518, 522 (1900).

The Court concurs with other courts to have considered students' claims of conversion against their universities in a pandemic tuition/fee restitution context and concluded that such claim cannot be maintained.  First, a plaintiff may not ordinarily recover for the tort of conversion for a breach of duty that simply restates a contractual obligation. S*ee e.g.*, *Nguyen*, 2021 WL 1186341, at *5 ("An omission to perform a contract obligation is never a tort, unless

---

[33] More fundamentally, conversion is the intentional or wrongful exercise of ownership or control by defendant over the personal property of another to which it has no right of possession.

that omission is also an omission of a legal duty.") (citations omitted).[34] Moreover, Plaintiffs simply cannot bring a conversion claim for refund of an unspecified pro-rata portion of their tuition and mandatory fees transferred to and intermingled with other funds held by Defendant. *See, e.g.*, *Bergeron*, 2020 WL 74866682, *10 (dismissing conversion claim as students failed to allege "a specific identifiable fund and an obligation to return or otherwise treat in a particular manner the specific fund in question" and students "voluntarily paid tuition and fees to [university]" for rights/privileges, upon which payment "title legitimately passed to [university]"); *Nguyen*, 2021 WL 1186341, at *5-6 ("An obligation to pay an unspecified, nonidentifiable amount of a 'pro-rata share of tuition and fees' . . . is insufficient to qualify for recovery under a conversion claim.") (citing *Saroya*, 2020 WL 7013598, *7 (collecting cases for proposition that "obligation to pay money, like Plaintiff's claim for partial tuition reimbursement, is insufficiently tangible to qualify as property" for purposes of conversion claim)); *Arrendondo*, 2021 WL 1588995, *4 (finding prayer for an unspecified amount of pro-rated portion of tuition and fees "fatal to Plaintiff's conversion claim"); *Omori,* 2021 WL 1408115, *4 (same); *Metzner,* 2021 WL 1146922 ("As the bailee/bailor vs. debtor/creditor distinction . . . illustrates, where the dispute arises from the defendant's failure to remit or refund payment pursuant to an agreement between the parties as opposed to the defendant's failure to

---

[34] Where plaintiffs bring a claim for refund of payment pursuant to a contractual relationship between the parties, as opposed to a claim for failure to return property held in trust, the tort of conversion is generally inapposite. *See e.g., Brown & Brown, Inc. v. Cola*, 745 F.Supp.2d 588, 622–23 (E.D. Pa. 2010) ("Although [t]he mere existence of a contract between the parties does not automatically foreclose [their] raising a tort action[,] . . . a party cannot prevail on its action of conversion when the pleadings reveal merely a damage claim for breach of contract . . . . Courts have dismissed conversion claims under the gist of the action doctrine where the alleged entitlement to the chattel arises solely from the contract between the parties.") (citations omitted). *Cf. New Life Homecare, Inc. v. Blue Cross Blue Shield of Michigan*, 2009 WL 506376, at *5 (M.D. Pa. Feb. 27, 2009) ("Tort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreements between particular individuals . . . .").

return property held in trust . . . , the tort of conversion is inapposite.  [In addition], . . . Plaintiffs have not plausibly alleged that the purportedly wrongfully held tuition actually 'belonged' to" them once relinquished to pay for semester's tuition).

Defendant's Motion to Dismiss will therefore be granted as to this claim.


## V.  CONCLUSION

The Court concludes that Plaintiffs' claims for (a) breach of an implied contract for a traditional in-person, on-campus experience for the Spring 2020 semester and (b) unjust enrichment or *quantum meruit* in the alternative are not precluded and that, drawing all reasonable inferences in their favor, Plaintiffs have sufficiently identified facts that suggest a plausible entitlement to recovery/restitution.  Defendant's Motion to Dismiss, ECF No. 25, will therefore be denied as to those Counts of the Complaint.  The Court further concludes that Plaintiffs have failed to state a claim of conversion, and Defendant's Motion will therefore be granted as to that Count.  A separate Order will be entered.

Dated:  August 11, 2021                                      BY THE COURT:

 

 

 

 
_____
LISA PUPO LENIHAN
United States Magistrate Judge